UNITED STATES of America, Appellee,

v.

**Martin L. CHEATHAM, Appellant.**

UNITED STATES of America, Appellee,

v.

**Jack P. CUNNINGHAM, Appellant.**

Nos. 89–5094, 89–5095.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 11, 1989.

Decided April 2, 1990.

Paul Engh, Minneapolis, Minn., for appellant Cheatham.

Charles Hawkins, Minneapolis, Minn., for appellant Cunningham.

Joan E. Lancaster, Minneapolis, Minn., for appellee.

Before McMILLIAN, JOHN R. GIBSON, and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Martin L. Cheatham and Jack P. Cunningham appeal their convictions on counts of aiding and abetting mail fraud, a violation of 18 U.S.C. § 1341 (1988). Cheatham was convicted on five counts; Cunningham was convicted on twenty-three counts. We affirm.

Cheatham and Cunningham both were employed by "CAN–AM." CAN–AM refers collectively to three corporations: CAN–AM Development Corp.; CAN–AM Mint and Trading, Ltd.; and Vets for Vets, Inc. The driving force behind CAN–AM was a man named Michael Crosby. Through its principals and employees, CAN–AM was responsible for the sale of a variety of products.

In the spring of 1986, CAN–AM moved to a leased office in a prestigious Northland Plaza office building in Bloomington, Minnesota. From this office, CAN–AM recruited and employed salesmen to telemarket three ounce silver commemorative Vets for Vets medallions to military veterans and other potential buyers. The medallions were to be produced by the Johnson–Matthey Mint in Toronto, Canada and were priced initially at $85.00 each. The silver content of each medallion was worth approximately $21.00.

Buyers were told that 50% of the profits from the sale of these medallions would be used to fund a park in the Black Hills of South Dakota to commemorate the living and dead veterans of all wars, particularly the war in Vietnam. Marketing of the medallions was aided by a promotional video about the memorial park featuring retired Air Force General Chuck Yeager.

CAN–AM sold the medallions in typical boiler room fashion, relying on high-pres-

sure sales. The standard sales pitch began with an initial call, after which a packet of information was mailed to the potential customer. A brochure, picturing an impressive-looking office building at Northland Plaza with the caption "CAN–AM World Headquarters," touted CAN–AM as a company of international flavor, claiming falsely that the company was involved in the development of real estate and the acquisition of insurance companies and banks. A few days after the mailing of the packet of information, a salesman would call the potential buyer and follow a prepared sales script. Stressing the veterans' memorial park project, the salesman promised that each purchaser would have his or her name inscribed on a monument as a supporter of this "American Cause." The medallions, represented to be 99.9% silver, were guaranteed to have a 12–month yield of 12%. Claiming that the medallions soon would be a collectors' item, the salesman urged the potential buyer to purchase quantities of 10, 50, or 100. Prompt delivery was assured.

The aggressive sales pitch worked. Approximately 5,900 medallions were sold to 412 persons, many of them elderly or veterans, for a total price of approximately $550,000.00. Once a customer agreed to purchase, a Federal Express messenger would be sent immediately to pick up the customer's check. The customer then was mailed a "Certificate of Authenticity" confirming the order.

Martin Cheatham was CAN–AM's second leading salesman. During his time at CAN–AM, from late May 1986 through November 1986, Cheatham was paid approximately $14,679.00 on a ten percent commission and was made a sales captain for his efforts. His successful sales techniques included calling a prospect several times a day claiming that he owned 100 medallions himself, which he did not, and that their value was sure to double or triple in a short time.

Jack Cunningham worked at the company from approximately May 1986 through September 1986. He came to CAN–AM at its inception with the founder of the organization, Michael Crosby, with whom he had worked previously. Cunningham first was a medallion salesman. Often using the name Jack Owens, he would convince customers that the value of the medallions was going to increase. Cunningham later was a sales manager and a "compliance officer," handling complaints from customers.

It was not long before purchasers began to sense that something was wrong at CAN–AM. Customers received mailings telling of delays in shipments due to a two-week annual summer shutdown at the Johnson–Matthey Mint, explaining a packaging problem at the Mint, describing delays caused by a Minnesota Department of Commerce inquiry, promising the direct shipment of the medallions, and, finally, allowing the customer to rescind the order.

Responding to customer complaints of nondelivery and an inquiry from the Pennsylvania Securities Commission, the Minnesota Department of Commerce began an investigation into CAN–AM's activities. Ultimately, cease-and-desist orders were issued against CAN–AM in Minnesota, Iowa, and North Dakota. The Minnesota cease and desist order prohibited further sales of the medallions in an investment manner. Sales could continue so long as delivery was made within 20 days and no representations were made to purchasers about the investment potential of the medallions. The Department of Commerce investigator personally ordered Cunningham to stop telling people that the Department was preventing delivery of the medallions, which it was not. Cunningham, however, continued to use this excuse.

Undaunted by the investigation, CAN–AM began selling Australian Nugget proof coin sets and Chinese Panda proof coin sets. Investors were promised prompt delivery upon receipt of funds. However, many received nothing but excuses for nondelivery.

In the final reckoning, no Vets for Vets commemorative medallions were shipped until January or February 1988, when only approximately 400 were sent to customers. Further, only a very small percentage of

those who requested their money back actually received it. No Chinese Panda coins were delivered, and the Australian Gold Nugget proof sets that were delivered turned out to be far less valuable uncirculated sets.

The memorial park never was built. The land that Crosby had contracted to purchase was foreclosed upon and the project architect was paid with a bad check. CAN–AM, never having paid its rent, moved out of its Northland Plaza office without notice while eviction proceedings were pending. Many unpaid bills were left behind.

In April 1988, an indictment was filed in the District of Minnesota against, among others, Michael Crosby, Martin Cheatham, and Jack Cunningham charging multiple violations of 18 U.S.C. §§ 1341, 1342. Cunningham moved for severance of his trial from that of his co-defendants on the ground that he would be prejudiced by the joinder. The District Court[1] denied the motion. Three co-defendants entered plea agreements with the government, the government dismissed two co-defendant corporations from the case, and the lead defendant Michael Crosby absconded and was tried in absentia.

Following a four-week jury trial, Cheatham was found guilty on five counts of aiding and abetting mail fraud, a violation of 18 U.S.C. §§ 1341, 1342. He was sentenced to three years on each count, to be served concurrently. Cunningham was found guilty on twenty-three counts of violating the same statute and was sentenced to four years on each count, to be served concurrently.

For reversal, Cheatham and Cunningham contend that the District Court erred: (1) by restricting cross-examination of Michael Crosby's brother concerning the alleged fact that Crosby had committed a fraud upon his family by absconding after having persuaded them to provide collateral on his bond; (2) by denying the motion for mistrial made after government witnesses stated their opinion as to guilt; (3) in instructing the jury as to the good faith

theory of the defense; and (4) by denying the motion for mistrial made as a result of the government's allegedly untimely *Brady* disclosure. Cunningham also argues that the district court erred by denying his motion for severance.

## I.

Cheatham and Cunningham first claim that the District Court violated their Sixth Amendment confrontation clause rights by restricting cross-examination of Michael Crosby's brother concerning the alleged fact that Crosby had committed a fraud upon his family by absconding after persuading them to provide collateral on his bond. Appellants argue that Crosby's alleged fraud upon his family is evidence of a continuing pattern of betrayal and of his extraordinary persuasive powers and, thus, supports their good faith defense. "Cross-examination of a witness is a matter of right." *Alford v. United States*, 282 U.S. 687, 691, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931). "It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry...." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985).

We are convinced that the Sixth Amendment was satisfied in this instance. On cross-examination of Michael Crosby's brother, Cheatham and Cunningham attempted to discuss Crosby's whereabouts, his bond, and his family's assistance to him in making bond. The District Court allowed evidence of Crosby's flight, but refused inquiry into the bond, counsel's offer of proof consisting of somewhat speculative assertions concerning the witness's behavior prior to trial and the contents of a

---

1. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

newspaper article he remembered seeing but did not have in hand.

Crosby's perfidy is documented on nearly every page of the trial transcript. Similarly, there was no shortage of evidence of his persuasive powers. The record shows that General Yeager believed in him, as did many others. One witness testified that Crosby could "sell a refrigerator to an Eskimo." Record at 1037. On this record, appellants had an ample factual basis for making substantially the same argument to the jury which they now claim they were disabled from making, and it is clear that they were not denied an opportunity for effective cross-examination. *See Fensterer*, 474 U.S. at 20, 106 S.Ct. at 294. We conclude, therefore, that the District Court's ruling did not violate the confrontation clause rights of Cheatham and Cunningham.

## II.

■ Cheatham and Cunningham next attack the District Court's jury instruction regarding their good faith defense. The instruction was given as follows:

Fraudulent intent, which is what the government must prove, is one of the elements of these offenses. Fraudulent intent is not presumed, it is not assumed, it is personal to each defendant. You don't impute it to anyone. One is chargeable with his own personal intent, not the intent of somebody else.

Bad faith is an essential element of fraudulent intent. You have heard the lawyers talk about good faith, good faith does constitute a complete defense to one charged with an offense, however fraudulent, of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him, or with a belief honestly entertained by him, is not chargeable with fraudulent intent, even though such opinion is erroneous and such belief is a mistaken belief.

Evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent. In order to establish fraudulent [sic] on the part of a defendant, it must be established that such person knowingly and intentionally attempted to deceive somebody else. One who knowingly and intentionally deceives another is chargeable with fraudulent intent, notwithstanding the manner and form in which the deception was attempted.

On the other hand an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed, would not in and of itself, constitute good faith as used in these instructions; if in carrying out that venture the defendant knowingly made false or fraudulent representations to others with a specific intent to deceive them.

Record at 2466–67. Cheatham and Cunningham argue that the trial court erroneously added the last paragraph, which they contend completely negates the substance of their requested instruction.

Although defendants are entitled to an instruction on their theory of defense if a timely request is made, the evidence supports the proffered instruction, and the instruction correctly states the law, *United States v. Casperson*, 773 F.2d 216, 223 (8th Cir.1985), " '[a] district court has wide discretion in formulating appropriate jury instructions. A defendant is not entitled to a particularly worded instruction where the instructions given, when viewed as a whole, adequately and correctly cover the substance of the requested instruction.' " *United States v. Ridinger*, 805 F.2d 818, 821 (8th Cir.1986) (quoting *United States v. Reda*, 765 F.2d 715, 719 (8th Cir.1985)).

The charge to the jury in the present case fairly states the applicable law and suitably covers the substance of the requested instruction. The first three paragraphs paraphrase the instruction submitted by Cheatham and Cunningham, which is based upon a good faith instruction approved by this Court in *United States v. Ammoms*, 464 F.2d 414, 417 (8th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972).

The final paragraph, taken verbatim from Eleventh Circuit Criminal Jury Instruction 13 [2], also contains an accurate statement of the law of this Circuit. Its precise language recently has been submitted for use in this Circuit by a committee composed of district court judges and practicing attorneys. *See* Eighth Circuit Criminal Jury Instruction 9.08 note 2(c). Further, it is well-established that actions indicating a belief in the ultimate success of a business do not absolve defendants from liability for making misrepresentations in order to promote that business. *See United States v. Wrehe,* 628 F.2d 1079, 1082–83 (8th Cir.1980). *See also United States v. Henderson,* 446 F.2d 960, 966 (8th Cir.) ("[T]he criminal law does not condone ignorance of facts as an excuse for reckless misrepresentations made to induce innocent victims to part with their money when the facts would require some preliminary investigation."), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). We conclude that the District Court properly instructed the jury regarding appellants' good faith defense.

### III.

Cheatham and Cunningham contend that the District Court erred by denying the motion for mistrial made as a result of the government's allegedly untimely *Brady* disclosure. They complain that the government did not timely disclose two pieces of relevant, material, exculpatory evidence: (1) a list showing the 380 CAN–AM customers who actually received their Vets for Vets medallions; and (2) statements made by a co-defendant to the government. "The holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (quoting *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215

(1963)). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383.

■ Applying these standards, we first examine the list of customers who did, in fact, receive their medallions. The prosecution apparently received this document ten days before closing arguments were scheduled to commence, at which time it was disclosed.[3] Although the District Court granted the defense a continuance to explore the contents of the list, Cheatham and Cunningham contend that the late disclosure of information allegedly material to the issue of guilt and to the good faith defense was so prejudicial as to prevent them from receiving a fair trial.

While the customer list arguably is favorable to appellants, we do not believe that its earlier disclosure would have had any effect on the outcome of the trial. Not only did the indictment specifically acknowledge that 400 medallions were delivered to customers, but also the government's opening statement mentioned the delivery of about 400 medallions. Further, Cheatham and Cunningham requested and received a continuance at the time of disclosure, after which the defense made a decision not to call any of the medallion recipients as witnesses. The list then was received into evidence as a defense exhibit. In these circumstances, we are satisfied that no *Brady* violation has occurred.

■ We reach the same conclusion with regard to the statements made to the government by a co-defendant. Some time after indictment and before trial, the government entered into plea negotiations with CAN–AM's director of administration Tamara Kesler. During conversations with the government, Kesler opined that

---

2. We note that Cheatham originally requested that Eleventh Circuit Criminal Jury Instruction 13 be given.

3. The list previously had been in the possession of Tamara Kesler, CAN–AM's director of administration, with whom the government entered into plea negotiations before trial.

Cunningham, with whom she maintained a friendship, had not been involved in the scheme to defraud. While Kesler indicated at some point during the trial that she was willing to meet with defense counsel, she did not do so, and only after the verdict did the defense learn of her supposedly exculpatory statements.

We cannot say that there is a "reasonable probability" that disclosure of these comments would have changed the result of the proceeding. Kesler's opinion as to Cunningham's culpability is "not truly exculpatory evidence because it is inadmissible as it invades the province of the jury." *United States v. Thirion*, 813 F.2d 146, 156 (8th Cir.1987). And the rest of Kesler's statements to the government are not particularly helpful to the defense. She admitted that she did not know what was in her friend Cunningham's mind and told a government interviewer that she, along with the other CAN–AM employees, had to have operated with blinders on. One doubts that the defense would have wanted the jury to know the contents of Kesler's statements.

Moreover, defense counsel certainly were aware of Kesler's existence and were not prevented from speaking with her at any time. That she ultimately was unwilling to speak with them was not the fault of the government. The government simply advised her that it was her decision, about which she should consult with her attorney. No constitutional violation occurs when a witness chooses of her own volition not to be interviewed by the defense. *See United States v. Bittner*, 728 F.2d 1038, 1041 (8th Cir.1984). We conclude that the late disclosure of Kesler's statements did not amount to a violation of *Brady*.

### IV.

 Cheatham and Cunningham claim that the District Court erred by denying their motion for a mistrial made after government witnesses stated their opinion as to defendants' guilt. Cunningham also argues that the trial court committed error by denying his motion for severance.

Upon careful review, we find these arguments to be entirely without merit.

### V.

Finding no reason for reversal, we affirm the convictions.