# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1181

_____

United States of America,                    *
                                                        *
                                             *
        Plaintiff - Appellee,                *
                                             *
    v.                                       *
                                             *
Fernando Dwane Davis aka Duane               *
Davis,                                       *
                                             *
                                             *
        Defendant - Appellant.               *

_____                       Appeals from the United States
                                      District Court for the District
No. 97-1182                           of Minnesota.

_____

United States of America,                    *
                                             *
                                             *
        Plaintiff - Appellee,                *
                                             *
    v.                                       *
                                             *
Darnell Hines,                               *
                                             *
                                             *
        Defendant -Appellant.                *

_____

No. 97-1183

_____

United States of America,             *

                                                    *

          Plaintiff - Appellee,       *

                                      *

     v.                               *

                                      *

Paris Wilson,                         *

                                      *

                                      *

          Defendant - Appellant.      *


_____

No. 97-1230

_____

United States of America,             *

                                      *

                                      *

          Plaintiff - Appellee,       *

                                      *

     v.                               *

                                      *

Carlos Lamont Cleveland,              *

                                      *

          Defendant -Appellant.       *

_____

No. 97-1231

_____

United States of America,                  *

                                                        *

                                                        *

            Plaintiff - Appellee,          *

                                                        *

    v.                                             *

                                                        *

DeShaun Raffles Murphy,                 *

                                                        *

                                                        *

            Defendant - Appellant.      *


_____

No. 97-1232

_____

United States of America,                  *

                                                        *

                                                        *

            Plaintiff - Appellee,          *

                                                        *

    v.                                             *

                                                        *

Gerald Jarrett, aka Gerald Jarrett, aka     *

Gerald Desean Jordan aka Gerald Shawn*

 Jordan, aka Desean Gerald Jordan,      *

aka Aaron Desean Johnson, aka Turk,    *

                                                        *

            Defendant -Appellant.        *

-3-

_____

Submitted: December 10, 1997
Filed: August 19, 1998
_____

Before McMILLIAN, JOHN R. GIBSON, and MURPHY, Circuit Judges.
_____


JOHN R. GIBSON, Circuit Judge.


Fernando Davis, Darnel Hines, Paris Wilson, Carlos Cleveland, Deshaun Murphy, and Gerald Jarrett were convicted of conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 (1994), aiding and abetting possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1) (1994), and aiding and abetting the use or carrying of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (1994). Hines, Cleveland, Murphy, and Jarrett were also convicted of use of a minor in a conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 861(a)(1) (1994). All six appeal their convictions and all except Davis appeal from the sentences imposed[1] by the district court.[2] We affirm.


On October 24, 1995, Agent Jeffrey Burchett of the Minnesota Bureau of Criminal Apprehension received a phone call reporting a missing juvenile, Janelle Gilliam. He contacted the juvenile's mother, Cathy Bjornos, who told him that men had

---

[1]The district court sentenced Davis to 181 months, Hines to 420 months, Wilson to 295 months, Cleveland to 300 months, Murphy to 360 months, and Jarrett to life in prison.

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

come to Bjornos' house looking for Gilliam on the night of October 22, 1995, had given Bjornos a phone number where they could be reached if Gilliam returned home, and had called Bjornos' house five to six times later that night, at one point telling her that Gilliam had drugs belonging to them worth $16,000. Burchett also determined that the phone number belonged to Maria Scales and was assigned to an apartment at 909 East Eighteenth Street in Minneapolis, Minnesota.

Gilliam later contacted Burchett by telephone, and told Burchett that she had traveled to Detroit, Michigan, with Gerald Jarrett, Deshaun Murphy, and Carlos Cleveland. While in Michigan, she met Darnel Hines. She returned to Minneapolis by bus on October 22, 1995, carrying with her a package of narcotics. She informed Burchett that the drugs were being stored at a Red Roof Inn in Plymouth, Minnesota, and were being sold out of the 909 East Eighteenth Street apartment building.

Burchett obtained hotel records that Cleveland and Hines had registered for rooms at the Red Roof Inn during the month of October 1995. A hotel employee told Burchett that the individuals who had stayed in the rooms registered to Cleveland and Hines were currently staying in a room registered to Fernando Davis. Burchett obtained a warrant to search Davis's hotel room and contacted other law enforcement officers to assist in surveillance and in the execution of the warrant. The surveillance officers saw four individuals leave Davis's room and drive away. The officers stopped the car and identified the individuals as Hines, Cleveland, Tonya Washington, and Karen Bradley. The officers then searched Davis's hotel room where they found an unloaded Smith & Wesson .357 revolver and 84.9 grams of crack cocaine. Officers then placed Hines, Cleveland, Washington, and Bradley under arrest.

That evening, hotel staff at the Red Roof Inn called Officer John Christiansen of the Plymouth Police Department and informed him that individuals had returned to Davis's hotel room. After arriving at the hotel, Christiansen saw three men leave the hotel room and get into a car which the police stopped. Davis was identified as the

driver and Paris Wilson and Steve Howard as the passengers. The officers arrested Davis but released Wilson and Howard without questioning. Officers also discovered Gerald Jarrett and Deshaun Murphy still in the hotel room but did not arrest either of them.

The investigation by Burchett and other officers ultimately resulted in the indictment of eight individuals. Of those indicted, only the six appellants now before us proceeded to a jury trial. The two others, Patsy Kalfayan and Tonya Washington, entered guilty pleas and agreed to testify on behalf of the government. Another suspect, Steve Howard, was never apprehended. After a fourteen day trial, the jury found the defendants guilty of all counts of their indictments, and substantial sentences were imposed.

Further facts will be recited as is necessary in our analysis of the issues presented by the appellants.

## I.

The appellants contend that Agent Burchett's testimony as to the out-of-court statements of other witnesses was inadmissible hearsay. The government responds that Burchett's testimony was not hearsay because it was not offered for the truth of the matters asserted but instead was offered to explain his investigation of the alleged drug conspiracy. We review the district court's admission of evidence for a clear abuse of discretion. United States v. King, 36 F.3d 728, 732 (8th Cir. 1994).

Agent Burchett is a special agent with the Bureau of Criminal Apprehension and was in charge of the investigation into the alleged drug conspiracy. At trial, Agent Burchett testified to information he learned solely through hotel or car rental documents or through the out-of-court oral statements of hotel staff, other police officers, and informants, including Janelle Gilliam and her mother, Cathy Bjornos. The defendants

initially objected to each such instance, and the district judge then allowed the defendants to enter a standing objection on the basis of hearsay. The district court overruled the objections, reasoning that testimony as to what Burchett learned was not hearsay. The district court also declined to instruct the jury as to the limited purpose of Burchett's testimony.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). An out-of-court statement is therefore not hearsay if it is offered, not for the truth of the matter asserted, but instead to explain the reasons for or propriety of a police investigation. See United States v. Collins, 996 F.2d 950, 953 (8th Cir. 1993). We have held, however, that evidence may not be admitted for the non-hearsay purpose of explaining an investigation where the propriety of the investigation is not a relevant issue at trial. See United States v. Blake, 107 F.3d 651, 653 (8th Cir. 1997).

The government contends that defense counsel repeatedly attacked the criminal investigation as defective or improperly motivated and thereby placed the propriety of the investigation in issue. Appellants argue that defense counsel did not attack the investigation itself but merely the credibility of the government's witnesses. Burchett was the government's first witness, so if defense counsel raised the investigation as an issue, they must have done so during opening statements.

We conclude that, while defense counsel's attacks in their opening statements largely focused on the credibility of individual witnesses, the government could have reasonably interpreted their comments as attacks on the propriety of the investigation. Defense counsel stated that the evidence would show that the government did not conduct "any independent investigation" to verify Gilliam's story and made "automatic assumptions" about the defendant's guilt. We therefore hold that the investigation was placed at issue.

Having concluded that a relevant, non-hearsay purpose may have existed for the challenged testimony, we must next determine whether Burchett's testimony was reasonably directed towards that purpose. This determination is not based on the wording of Burchett's testimony, whether he testified in terms of what the informants stated or in terms of what he learned from them during his investigation. Instead, we compare the substance of the testimony to the non-hearsay purpose it is supposed to have served. Burchett's account of what he learned from Gilliam may have gone beyond what was necessary to explain his investigation, but, for the most part, the challenged testimony helped establish that Burchett conducted an independent investigation of Gilliam's claims and did not automatically assume the defendants' guilt. While we are troubled by the absence of a limiting instruction during Burchett's testimony, we are satisfied that the district court did not abuse its discretion in admitting the challenged testimony.

## II.

Davis argues that the district court erred in admitting evidence of his prior arrest for possession of a firearm.[3] The government responds that the evidence was admissible under Fed. R. Evid. 404(b) because it was relevant to Davis' knowledge, intent, and lack of mistake concerning the use or carrying of the gun discovered in the Red Roof Inn room on November 4, 1995.

Under Rule 404(b), evidence of past crimes, wrongs, or acts is not admissible for the purpose of proving a defendant's criminal disposition, but may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan,

---

[3]Hines, Wilson, and Murphy join in Davis's argument claiming that the evidence had a prejudicial impact on their own cases. However, because they lack standing to challenge the evidence on Rule 404(b) grounds, they instead contend that admission of the evidence was grounds for severance. We address these claims separately in section IV of this opinion.

knowledge, identity, and absence of mistake or accident. Fed. R. Evid. 404(b). We review the district court's decision to admit evidence under Rule 404(b) for an abuse of discretion and reverse only if it is clear that the evidence had no bearing on a material issue. See United States v. Yerks, 918 F.2d 1371, 1373 (8th Cir. 1990).

Officer Gerald Barzyk of the Detroit Police Department testified that on the morning of January 10, 1993, he heard what sounded like a barrage of gunfire. He drove to investigate the shots and saw Davis apparently fleeing the scene. Barzyk searched Davis and, finding a loaded .38 caliber handgun, arrested him. The case was referred to traffic court, Davis received a diversion, and the gun charge was expunged from his record. The district court held that Barzyk's testimony was not relevant to Davis's intent to aid and abet the use or carrying of a firearm in a drug crime, but was relevant to show Davis's knowledge and lack of mistake.

Davis argues that his earlier gun charge was too dissimilar to be relevant to his knowledge or lack of mistake in this case. Davis points out that the earlier alleged crime did not involve drugs, the same firearm, or any of his alleged co-conspirators in the instant case. While this court has held that past acts admitted under Rule 404(b) must be similar in kind to the charge crime, see Yerks, 918 F.2d at 1373, the degree of similarity required necessarily depends on the purpose for which the past acts evidence is admitted.

In this case, the government presented substantial evidence connecting Davis to the gun, including testimony that Davis escorted Howard when Howard carried the gun to the hotel room where the drugs were stored. Davis's position throughout trial, however, was that he was merely present among his co-defendants and in the hotel room and was not a knowing participant in their crimes. Thus, an important issue at trial was whether Davis knew that he was helping Howard carry the firearm to the drug safehouse. See United States v. Thomas, 58 F.3d 1318, 1321-22 (8th Cir. 1995) (holding that "mere presence" defense raises issue of defendant's mental state, making

Rule 404(b) evidence admissible). Davis's earlier experience with the concealment of a firearm, even if factually distinct from the events in this case, was nonetheless relevant to showing that knowledge. The district court did not abuse its discretion in allowing evidence of the earlier arrest.

## III.

All of the appellants, except Jarrett, argue that the district court abused its discretion in admitting taped telephone conversations between Jarrett and his girlfriend, Patsy Kalfayan. While in custody at the Anoka County Jail, Jarrett made four telephone calls to Kalfayan in an effort to convince her not to cooperate with law enforcement officials. During these calls, Jarrett threatened Kalfayan and suggested that other individuals would also seek revenge against her if she testified. The district court had the original tapes redacted to limit possible references to the other defendants. The court admitted the redacted tapes into evidence, and transcripts were provided to the jury. The appellants contend that, despite redaction, the tapes and transcripts were prejudicial and therefore inadmissible under Rule 403 of the Federal Rules of Evidence.[4]

Rule 403 allows the district court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. See United States v. Guerrero-Cortez, 110 F.3d 647, 652 (8th Cir. 1997). We give deference to a district court's decision under the Rule 403 balancing test and reverse only if there was a clear abuse of discretion. See id.

---

[4]In support of this argument, appellants cite extensively to Bruton v. United States, 391 U.S. 123 (1968), in which the Supreme Court held that the admission at trial of a defendant's confession that expressly implicates codefendants is a violation of the codefendants' rights under the Confrontation Clause. Bruton, however, does not apply where, as here, the declarant defendant testifies at trial. See United States v. Coco, 926 F.2d 759, 761 (8th Cir. 1991).

The district court held that the tapes and transcripts had probative value in that they were evidence of Jarrett's consciousness of guilt. Courts may admit evidence of threats against government witnesses on the grounds that an effort to intimidate a witness tends to show consciousness of guilt. See id. Appellants argue, however, that the evidence was unnecessary to convict Jarrett in this case because several witnesses had already testified to Jarrett's possession of drugs and a firearm. We are hesitant to conclude that the testimony of other witnesses made this evidence unnecessary when appellants have repeatedly attacked the credibility of those other witnesses.

The prejudicial impact of the tapes stems primarily from Jarrett's references to unnamed individuals. Though the court deleted some of these references from the original tapes, the redacted conversations still contained statements by Jarrett that "they" know that Kalfayan is testifying and suggesting "they" will do something to her. Appellants contend that the jury may have considered Jarrett's statements and threatening behavior as evidence of his co-defendants' guilt. The court, however, instructed the jury before the tapes were played that they were only to be used against Jarrett and not against the other defendants. This court has been reluctant to hold that evidence was unfairly prejudicial when the district court gave an appropriate cautionary instruction. See United States v. McCarthy, 97 F.3d 1562, 1573 (8th Cir. 1996) (citing United States v. Baker, 82 F.3d 273, 276 (8th Cir. 1996) and United States v. Butler, 56 F.3d 941, 944 (8th Cir. 1995)).

Jarrett did not name or otherwise specifically identify any of the defendants in the redacted conversations. The trial involved multiple defendants, and Jarrett testified that he had dealt drugs along with three individuals who were not defendants at trial. Thus, while the conversations may have suggested that there were other guilty parties besides Jarrett, the conversations did not indicate that any particular co-defendant was guilty. In light of these factors, we cannot say the district court abused its discretion in admitting the taped conversations.

## IV.

The appellants contend that the district court abused its discretion in failing to grant a severance of the defendants' trials. Appellants allege several grounds for severance, including the introduction of Jarrett's phone conversations with Kalfayan, evidence that Jarrett assaulted Washington and Kalfayan, and evidence of Davis's previous firearms arrest and Jarrett's previous criminal acts. We reverse a district court's denial of severance only upon a showing of clear prejudice and abuse of discretion. United States v. Drew, 894 F.2d 965, 967 (8th Cir. 1990). Rarely, if ever, will it be improper for co-conspirators to be tried together. See id. at 968.

Appellants' argument for severance based on Jarrett phone conversations essentially mirrors their Rule 403 argument, and we reject it for reasons already stated in section III of this opinion. The assault against Washington was committed during and arguably in furtherance of the conspiracy and was therefore admissible against all of the defendants and so was not grounds for severance. Kalfayan's testimony that Jarrett frequently abused Kalfayan did not suggest that any of the other defendants were involved in the abuse, and the district court instructed the jury that Kalfayan's testimony applied only to Jarrett. Likewise, the evidence of Jarrett's and Davis's earlier arrests did not suggest the involvement of the other defendants and was accompanied by limiting instructions from the district judge. The remaining grounds cited by appellants are simply not substantial enough to require severance. Accordingly, we hold that the district court did not abuse its discretion in failing to grant appellants' motions for severance.

## V.

The appellants also contend that the prosecution's use of a peremptory strike against the only Native American on the venire was intentionally discriminatory and that the district court clearly erred in finding otherwise. We are unpersuaded.

-12-

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), the Supreme Court outlined a three-step process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection Clause.  First, the defendant must make a prima facie showing that the prosecution made its peremptory challenge on the basis of race.  <u>Id.</u> at 96-97.  Once a prima facie showing is made, the burden shifts to the prosecution to provide a racially neutral explanation for its challenges.  <u>Id.</u> at 97.  Finally, the trial court must determine whether the defendant has established purposeful discrimination.  <u>Id.</u> at 98.

Because the government offered a race neutral explanation for its peremptory challenge, we need not address whether the defendants made a prima facie case.  <u>See</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991).  We thus turn to the issue of whether the government's race-neutral explanation was sincere or merely pretextual.  This is a factual inquiry and we therefore give great deference to the district court's determination.  <u>See</u> <u>id.</u> at 364.

The government's attorney stated that it struck the Native American panelist because she was a guidance counselor and a qualified chemical dependency counselor.  The appellants responded that the government's concerns were plainly pretextual because the government did not challenge a white juror who was involved with a teen clinic and did not challenge three white jurors who were involved in the D.A.R.E. program and who had relatives in law enforcement.  As the government pointed out to the district court, however, volunteer work with a drug prevention program or a teen clinic is significantly different from employment as a chemical dependency counselor in terms of experience, expertise, and perspective.  A chemical dependency counselor, for example, would presumably have a history working with current drug users, which the government could reasonably believe would affect her assessment of some witnesses who are themselves drug users.

The defendants' other evidence of pretext was the government's failure to

propose any voir dire questions on the issue of chemical dependency expertise. While a trial court could consider such evidence, the government's failure to solicit certain information through voir dire questioning does not necessarily mean that the government would not be concerned about the information once it becomes known. Accordingly, we conclude that the district court did not clearly err in accepting the government's race-neutral explanation.

## VI.

The appellants argue that the district court erred in not giving more specific instructions with regard to Count IV, aiding and abetting the use or carrying of a firearm during and in relation to a drug trafficking crime. First, appellants contend that the jury was not told it would have to unanimously agree either that the defendant aided and abetted the use or carrying of a firearm or that the defendant could reasonably foresee that a co-conspirator would commit the offense of aiding and abetting.[5] We review a district court's decision not to give a specific unanimity instruction under the clearly erroneous standard. See United States v. Jelinek, 57 F.3d 655, 658 (8th Cir. 1995).

The district court instructed the jurors that their verdict in the overall case must be unanimous and that their verdict must be unanimous as to Count IV. Appellants, however, argue that these general unanimity instructions were inadequate in light of the court's jury instructions regarding liability under Count IV. In its instructions on Count IV, the court explained in detail the essential elements of the crime of using or carrying a firearm during a drug trafficking crime and instructed the jury that the instructions

---

[5]In their original briefs, appellants also argued that the district court erred in not giving a specific unanimity instruction regarding which firearm was used or carried for the purposes of Count IV. However, at oral argument, appellants conceded that the district judge instructed the jury that they were only to consider the firearm found in the Red Roof Inn hotel room.

given on aiding and abetting under Count III also applied to Count IV.

The court then instructed the jury on vicarious liability for co-conspirators as set forth in <u>Pinkerton v. United States</u>, 328 U.S. 640 (1946). The district court explained:

> If you unanimously find that a defendant is guilty of conspiracy, as charged in Count One of the indictment, you may also find that defendant guilty of an offense or offenses as charged in any one or more of Counts Two, Three, and Four of the indictment in which he is charged, provided that you find that each of the essential elements of any one or more of Counts Two, Three or Four, as defined in these instructions, has been established beyond a reasonable doubt, and provided that you also find beyond a reasonable doubt that:
> First. The offense or offenses defined in the non-conspiracy counts -- that is, Counts Two, Three, and Four -- was or were committed by a member of the conspiracy during and in furtherance of the conspiracy;
> Second. That the particular defendant was a member of the conspiracy at the time that the offense or offenses charged in Counts Two, Three, and Four was or were committed; and
> Third. That the offense or offenses defined in the non-conspiracy counts -- that is Counts Two, Three, and Four -- were in furtherance of and a natural or reasonably foreseeable consequence of the unlawful agreement -- that is the conspiracy.

Jury members were thus provided with two theories by which they could find a defendant guilty of Count IV -- aiding and abetting or <u>Pinkerton</u> liability. Appellants maintain that without a specific unanimity instruction, some jurors may have found a defendant guilty only of directly aiding and abetting while other jurors found the defendant guilty only through vicarious liability. In other words, appellants argue that the jury may have convicted defendants of Count IV without unanimously agreeing to either theory.

This court has repeatedly held that a general unanimity instruction is usually sufficient to protect a defendant's sixth amendment right to a unanimous verdict. <u>See</u>

-15-

United States v. Gruenburg, 989 F.2d 971, 975 (8th Cir. 1993) (citing United States v. Montanye, 962 F.2d 1332, 1341 (8th Cir. 1992)). A district court may have to give a specific unanimity instruction where there is a genuine risk of jury confusion. Id. However, "[t]he mere fact . . . that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict." United States v. Hiland, 909 F.2d 1114, 1140 (8th Cir. 1990) (quoting Berrisford v. Wood, 826 F.2d 747, 754 (8th Cir. 1987)).

The district court sufficiently distinguished Pinkerton liability and the substantive offense of aiding and abetting as separate theories of guilt. See United States v. Lucas, 932 F.2d 1210, 1220-21 (8th Cir. 1991) (holding no plain error occurred where jury instructions clearly distinguished vicarious liability and aider and abettor liability as two different theories of guilt). Although the court instructed the jury on Pinkerton immediately after instructing on Count IV, the court explained that Pinkerton liability could be found with respect to Counts II, III, or IV. The court also explained that to find a defendant vicariously liable for Count IV, the jury must find that a member of the conspiracy committed the offense charged in Count IV, namely aiding and abetting in the use or carrying of a firearm in a drug trafficking crime.

Further, it is doubtful, under the facts of this case, that a jury member found a defendant guilty of aiding and abetting in the use or carrying of a firearm but would not have found that defendant culpable under Pinkerton. If any juror who found the defendants guilty of directly aiding and abetting would also find the defendants vicariously liable, then no unanimity problem exists because all of the jurors would have at least agreed on the Pinkerton theory of guilt.

As outlined in the jury instructions, Pinkerton liability requires that a member of the conspiracy committed the offense in furtherance of the conspiracy at a time when the defendant was also a member of the conspiracy and that the offense was a

-16-

reasonably foreseeable consequence of the unlawful agreement. Pinkerton, 328 U.S. at 646-48; see also United States v. Lucas, 932 F.2d at 1220. Obviously, an aider and abettor could foresee his own act of aiding and abetting as a natural consequence of the conspiracy. Therefore, the risk of a non-unanimous verdict rests on the likelihood that a jury member found a defendant guilty of directly aiding and abetting in the use or carrying of a firearm in a drug trafficking crime but believed that the defendant either did not do so in furtherance of the conspiracy or was not a member of the conspiracy at the time.

The jury found that the appellants were all members of the same drug conspiracy, that they were all complicit in the use or carrying of the same firearm, and that the firearm was used or carried in furtherance of a drug crime for which they were all found guilty. None of the parties presented any theory or evidence of the firearm being used or carried in a drug crime unrelated to the conspiracy. We therefore conclude that the district court's decision not to provide a specific unanimity instruction was not clearly erroneous.

Next, appellants contend that the district court should have instructed the jury more clearly that, to be vicariously liable for a firearm, the defendant must have foreseen that the firearm would be "used" or "carried" as defined in Bailey v. United States, 116 S. Ct. 501 (1995). We reject this argument.

In explaining the substantive offense charged in Count IV, the district court instructed the jury that to be "used", a firearm must be "actively employed." The district court then listed the examples of using a firearm which were provided in Bailey, 116 S.Ct. at 503. The district court later instructed the jury that, for a defendant to be vicariously liable for a non-conspiracy count, the offense "defined in the non-conspiracy count[]" must have been "in furtherance of and a natural or reasonably foreseeable consequence of the unlawful agreement." This instruction adequately referred the jury to the district court's earlier explanation of Count IV, including its

-17-

definition of "use" of a firearm.  Accordingly, we conclude that the district court did not err in its instructions.

## VII.

The appellants contend that the government engaged in several instances of prosecutorial misconduct.

"The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial."  United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985).  In determining the prejudicial effect of prosecutorial misconduct, the courts generally consider the cumulative effect of such misconduct, the strength of the properly admitted evidence of the defendant's guilt, and the curative actions taken by the trial court.  See id. at 460.

Appellants contend that it was misconduct for the United States Attorney for the District of Minnesota to issue, one week before trial, a press release which announced the arrests of a group known as the "Detroit Boys," and which led to a front page article in The Star Tribune, a Twin Cities area newspaper.  According to the article, the Detroit Boys were a group of young men, originally from Detroit, who set up drug dealing operations in the Twin Cities and ran a distribution system very similar to the operation that the appellants were accused of running.  The appellants, however, were not among the individuals identified as members of the Detroit Boys drug operation, nor were the appellants directly referred to in the article.  The individual prosecutors in this case maintain that they were unaware of the United States Attorney's intention to issue the press release.

The issuance of a press release describing a similar operation before trial is

fraught with the risk of reversal. The district court in this case, however, took substantial steps to alleviate the possible impact of the press release on the jury. First, the defendants were allowed to draft a jury questionnaire focusing on possible bias stemming from the pretrial publicity. Individual jury panelists who answered in their questionnaires that they were familiar with the "Detroit Boys" were questioned individually outside the presence of the other prospective jurors so that their answers would not prejudice the jury as a whole. The court asked the individual panelists whether they could effectively distinguish the Detroit Boys article from the defendants' case. In addition, the court instructed the entire jury panel that the publicity surrounding the Detroit Boys did not relate to the defendants. Finally, the district court ruled that the government could not introduce evidence that the defendants referred to themselves as Detroit Boys or were affiliated with a gang. In light of the steps taken by the district court, we conclude that the press release was not so prejudicial as to deprive the defendant's of a fair trial.

Appellants also cite several instances in which the government allegedly committed misconduct by introducing or eliciting evidence that appellants claim was prejudicial or otherwise inadmissible. One of these instances involved Agent Burchett's alleged hearsay testimony, an issue which we have previously addressed.

Appellants argue that it was misconduct for the government to elicit testimony from Gilliam that Murphy had asked her to perform sex acts with Cleveland and Hines and that she refused. At a pretrial motions hearing, the district court rejected the government's argument to bring this testimony in as evidence of intimidation and warned the government that eliciting the testimony might result in a mistrial. During the trial, however, the government argued to the court that the defendants had opened the door to questioning on sexual activity through their opening statements and cross-examination of Agent Burchett, by referring to Gillliam as a prostitute and as someone who was "no stranger to sex." The district court held that the door had been opened and that the testimony was admissible to explain Gilliam's behavior during the time she was with the defendants. Under these circumstances, we cannot conclude that eliciting

-19-

the challenged testimony was improper.

Appellants contend that the government improperly elicited testimony from Maria Scales that members of the conspiracy would give women drugs in exchange for sex. The challenged testimony was brief, was not sensationalized, and was arguably relevant to how the conspirators distributed drugs and why their incomes may not have accurately reflected their drug sales. Further, the appellants' claim that the testimony prejudicially affected their substantial rights is weakened by the fact that, while defense counsel objected that the testimony lacked foundation, they did not object to the testimony as irrelevant or unfairly prejudicial at trial. We therefore conclude that eliciting Scales's testimony was not prosecutorial misconduct.

Appellants claim that the government improperly elicited testimony of threats and intimidation and elicited prejudicial expert testimony on the standard practices of drug dealers. Some of the challenged testimony was first elicited by defense counsel and some was at least plausibly relevant. In those instances where witness testimony or government inquiry was inappropriate, the district court adequately responded by sustaining defense counsel's objections and having challenged testimony stricken from the record. Accordingly, we reject these claims of misconduct.

Appellants argue that the government improperly interfered with appellants' access to five government witnesses. By appellants' own admissions, four of these witnesses told defense counsel in person that they did not wish to be interviewed. Appellants contend, however, that the witnesses had been "obviously coached" and "had been instructed not to answer questions." This is pure speculation; the record contains no evidence whatsoever as to what communications, if any, occurred. Even if the government informed the witnesses that they did not have to answer defense counsel's questions, the government does not interfere when it merely advises witnesses of their right to decide whether or not to submit to pre-trial interviews. See United States v. Cheatham, 899 F.2d 747, 753 (8th Cir. 1990). Whether the government

crossed the line from mere consultation to active interference is a matter which appellants cannot establish from evidence in the record.

One witness, Officer Kevin Pregler, admitted to having told Cleveland's attorney that one of the prosecutors told Pregler not to talk with defense counsel, but explained that he had misspoken and that he was never instructed not to speak with defense counsel. Pregler testified that Agent Burchett indicated that Pregler was under no obligation to do so. The district court made no factual findings on the issue, but asked Pregler to talk with defense counsel, and Pregler agreed. Because Pregler ultimately agreed to speak with defense counsel before taking the witness stand, anything the government may have said to him regarding pre-trial interviews did not affect appellants' right to a fair trial.

Further, appellants argue that Pregler's testimony evidences more widespread and unremedied government interference. As an appellate court, we have no power to assess Pregler's credibility. Even if the government crossed the line in its discussions with Pregler, we could not assume that the government crossed the line in its communications with other witnesses. Accordingly, we reject the appellants' claim of improper government interference.

In their briefs, appellants list nine other claims of misconduct relating primarily to government remarks made during trial. Having reviewed each of the alleged instances of misconduct, we conclude that these remaining claims do not provide sufficient grounds for reversal. Many of the challenged remarks, when placed into context, were simply not improper. When the government did act improperly by asking argumentative questions or referring to defendants as an "organization," the district court ably responded by sustaining objections, admonishing the government in the presence of the jury, and even issuing cautionary instructions to the jury. On one occasion, the government questioned a witness in such a manner that may have left the jury with the incorrect impression that the witness had positively identified defendant

Hines from a photo spread. The prejudicial effect of any misconduct was eliminated when the witness admitted on cross-examination that she had been unable to positively identify Hines and instead had only recognized him as someone who "looked familiar."

On a few occasions, the government made improper statements or asked improper questions that were not effectively remedied by district court admonitions or through cross-examination. Nonetheless, we are satisfied that the government's improper comments and questions, even when viewed in combination with the government's other inappropriate actions, were not so prejudicial as to deny the appellants the right to a fair trial. Accordingly, we reject the appellant's claims of prosecutorial misconduct.

## VIII.

Cleveland, Hines, and Davis argue that the evidence was insufficient to convict them on any of the counts for which they were indicted.[6] Murphy challenges the sufficiency of the evidence only with respect to Count IV, the firearms count.

"In reviewing the sufficiency of the evidence to support a guilty verdict, we look at the evidence in the light most favorable to the verdict and accept as established all reasonable inferences supporting the verdict. We then uphold the conviction only if it is supported by substantial evidence." United States v. Plenty Arrows, 946 F.2d 62, 64 (8th Cir. 1991); see also Glasser v. United States, 315 U.S. 60, 80 (1942).

The sufficiency challenges relating to Counts I, II, and III are, for the most part, challenges to the credibility of the government witnesses. As we have often stated, the

---

[6]As previously stated, Hines and Cleveland were charged and convicted of Counts I, II, III, IV. Davis was charged and convicted of Counts I, III, and IV only.

jury is the ultimate arbiter of witness credibility.  See United States v. Slaughter, 128 F.3d 623, 628 (8th Cir. 1997).  The defendants in this case took great care both on cross-examination and during closing arguments to bring the weaknesses of the government witnesses and their testimony to the attention of the jury.  This does not demonstrate insufficiency of the evidence.

With regard to Count I, conspiracy to distribute, and Count III, aiding and abetting possession with intent to distribute, witnesses testified that both Hines and Cleveland personally sold crack from an apartment in the Redeemer Arms apartment building and delivered the proceeds to Jarrett.  Although no witness saw Davis personally handling or selling drugs, Davis was present when  crack cocaine was being processed and took part in assaulting Washington in an attempt to find a missing package of drugs.  Further, law enforcement officers discovered over eighty-four grams of crack cocaine in a hotel room registered under Davis's name.

With regard to Count II, use of a minor in a conspiracy to possess and distribute crack cocaine, Hines personally made sure Gilliam purchased a bus ticket to transport drugs from Detroit to Minneapolis and met Gilliam in Chicago in order to verify that she changed buses.  For his part, Cleveland talked with Jarrett about having Gilliam transport the drugs to Minneapolis and was among the men who met Gilliam at the bus station when she arrived in Minneapolis with the drugs.  Whether or not Cleveland's actions were sufficient to constitute use of a minor, they undoubtedly establish that Cleveland could reasonably foresee Gilliam's involvement in transporting the drugs.  Thus, the jury could have found Cleveland vicariously, if not directly, liable for the recruitment of Gilliam into the conspiracy.  See Pinkerton, 328 U.S. at 646-48.  Accordingly, we conclude that the evidence was sufficient to convict Hines, Cleveland, and Davis of Counts I and III and to convict Hines and Cleveland of Count II.

We next examine whether the evidence was sufficient to convict the appellants

of Count IV, aiding and abetting the use or carrying of a firearm during or in relation to a drug trafficking crime. The first question is whether the government presented sufficient evidence that the firearm identified in the indictment, a silver-colored .357 Magnum found in the Red Roof Inn hotel room, was actually used or carried during and in relation to a drug crime within the meaning of 18 U.S.C. 924(c)(1) (1994).

In Bailey v. United States, 116 S.Ct. 501, the Supreme Court defined "use" to require the "active employment" of a firearm. Id. at 505. "The active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 508. The government presented no theory as to how any conspirator "actively employed" the firearm while at the Red Roof Inn. Indeed, the evidence on the issue suggests that the firearm remained hidden under a mattress from the time Steve Howard brought it into the hotel room until police conducted their search. However, there was evidence that the firearm found in the hotel room is the same firearm that was repeatedly used earlier in the conspiracy.

Washington testified that Howard, Wilson, and Murphy kept a "little silver gun" in the upstairs apartment at 909 East Eighteenth Street during drug sales. According to Washington, whenever a buyer came to the door, one of the three men would answer the door, holding the firearm in plain sight. They would then hide the gun under the couch. Similarly, Paige testified that Howard and Wilson kept a ".357 magnum" "[i]n the couch" in the upstairs apartment. From these descriptions, the jury could have reasonably inferred that the gun displayed during drug sales at the 909 East Eighteenth Street apartment was the same firearm found in the Red Roof Inn hotel room. Thus, the evidence was sufficient to show use of the firearm at issue.

In addition to presenting evidence of "use," the government also presented evidence that the gun at issue was "carried" "during and in relation to" a drug crime within the meaning of section 924(c)(1). Washington testified that on November 1,

1995, she and other members of the conspiracy transported drugs by car from Detroit to the Twin Cities.  Howard traveled separately by bus and took with him two guns, including the .357 revolver.  Upon arriving in the Twin Cities, he met Davis and Cleveland who took him to the Red Roof Inn hotel room where the drugs were hidden.  Howard then hid the .357 revolver under a mattress in the hotel room and stored the other gun in the trunk of Washington's rental car.

There is little question that Howard carried the .357 revolver within the meaning of the statute.  See Muscarello v. United States, No. 96-1654, 1998 WL 292058, at  *2 (U.S.  June 8, 1998) (defining "carry" broadly such that "one can . . . 'carry firearms'  in a wagon, car, truck, or other vehicle that one accompanies"); United States v. White, 81 F.3d 80, 83 (8th Cir. 1996) ("[G]overnment must prove that [defendant] bore the firearm on or about his person . . . .")  However, it is not enough that a conspirator carried a firearm; the firearm must be carried "during and in relation to" a drug trafficking crime.  18 U.S.C. § 924(c)(1).

The Supreme Court explained in Smith v. United States, 508 U.S. 223 (1993), that the phrase "in relation to" is expansive but that, at a minimum, "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence."  Id. at 237-38.  Here, the conspirators had a practice of using guns in connection with their drug distribution scheme, and Howard was delivering the guns to the hotel room where the drugs were stored.  The jury could have reasonably inferred that Howard delivered the gun to the hotel room in order to protect the drugs and the drug dealers until the time of distribution.  Thus, the evidence was sufficient to show that carrying the firearm was related to the charged drug crimes of conspiracy to distribute and aiding and abetting possession with intent to distribute.  The "during" requirement was likewise met in that the delivery of the gun not only occurred within the time frame of the charged drug conspiracy  but was itself a step in that conspiracy.

The jury could have convicted the individual defendants based on either a direct aiding and abetting theory or under a <u>Pinkerton</u> theory of vicarious liability for co-conspirators. Murphy, Cleveland, and Davis could each have been convicted of personally aiding and abetting in the use or carrying of the firearm. Murphy not only took turns with Howard and Wilson using the firearm during drugs sales, he also helped keep the firearm hidden from view between sales. Cleveland and Davis helped in carrying the firearm by meeting Howard at the bus station and taking him to the Red Roof Inn.

In contrast, there was no evidence that Hines personally aided and abetted in either the use or carrying of the firearm at issue. Hines, however, was at least present when Jarrett threatened several of the co-conspirators with a different firearm in an effort to recover missing drugs. At that point, Hines knew that his co-conspirators possessed one or more firearms and could have reasonably foreseen that firearms would be used or carried during and in furtherance of the drug conspiracy. Given the scope and nature of the conspiracy, it was likewise foreseeable that his co-conspirators would assist in using and carrying firearms. As a result, the jury could have found Hines guilty of aiding and abetting under a vicarious liability theory. Accordingly, we conclude that the evidence was sufficient to convict Murphy, Cleveland, Davis, and Hines of Count IV.

## IX.

Appellants, with the exception of Davis, make numerous arguments concerning their sentences. Jarrett, Cleveland, and Murphy challenge as unconstitutional the disparity in base offense levels assigned for offenses involving crack cocaine as compared to offenses involving an equal quantity of powder cocaine. This argument has been rejected in numerous cases.

Hines, Cleveland and Murphy dispute the district court's factual finding that the

conspiracy involved between 500 grams and 1500 grams of crack cocaine. Hines argues that the district court erred in assigning him a two-level upward adjustment for his role as a manager or supervisor under United States Sentencing Guidelines § 3B1.1(c) (1997) and in failing to grant a two level downward adjustment for being a minor participant under U.S.S.G. § 3B1.2(b). Wilson likewise argues that the district court erred in declining to grant him a downward adjustment for being a minor participant. These are all factual issues, and we are not persuaded that the district court's findings were clearly erroneous.

Murphy argues that the district court double counted in assigning him a two level upward adjustment for being Gilliam's manager or supervisor when he was already convicted of using a minor to assist in a conspiracy to distribute crack. Murphy also contends that the court should have granted him a downward adjustment for acceptance of responsibility under U.S.S.G § 3E1.1, as well as a downward departure under U.S.S.G. § 5K2.0. Finally, Cleveland argues that the district court incorrectly concluded that it lacked the authority to consider his motions for downward departures under U.S.S.G. §§ 5K2.0, 5K2.12. We have carefully reviewed the appellants' arguments and the relevant portions of the record and conclude that the arguments are without merit.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.