# United States Court of Appeals
## For the Eighth Circuit
_____

Nos. 19-3293 & 20-1825
_____

United States of America,

*Plaintiff - Appellee,*

v.

Pawinee Unpradit,

*Defendant - Appellant.*
_____

No. 19-3313
_____

United States of America,

*Plaintiff - Appellee,*

v.

Thoucharin Ruttanamongkongul,

*Defendant - Appellant.*
_____

No. 19-3701
_____

United States of America,

*Plaintiff - Appellee,*

v.

Saowapha Thinram,

*Defendant - Appellant.*

——————————————————

No. 20-2905

——————————————————

United States of America,

*Plaintiff - Appellee,*

v.

Michael Morris,

*Defendant - Appellant.*

——————————————————

Nos. 20-3051 & 21-1341

——————————————————

United States of America,

*Plaintiff - Appellee,*

v.

Waralee Wanless,

*Defendant - Appellant.*

————————

Appeals from United States District Court
for the District of Minnesota

————————

Submitted: October 20, 2021
Filed: May 20, 2022
_____

Before COLLOTON, SHEPHERD, and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

This appeal comes after a trial in which five defendants were prosecuted for participation in a large sex-trafficking conspiracy. A jury found all defendants guilty of conspiracy to commit sex trafficking, *see* 18 U.S.C. § 1594, conspiracy to transport persons to engage in prostitution, *see* 18 U.S.C. §§ 371, 2421, conspiracy to engage in money laundering, *see* 18 U.S.C. § 1956, and conspiracy to use a communication facility to promote prostitution, *see* 18 U.S.C. §§ 371, 1952. The jury also found one of the five, Michael Morris, guilty of a substantive count of sex trafficking under 18 U.S.C. § 1591(a). The defendants now appeal various aspects of their convictions and the sentences imposed by the district court.[1] We conclude that there is no reversible error, and therefore affirm the judgments.

I.

The prosecution's evidence showed that the defendants and others were members of a conspiracy that recruited women in Thailand to move to the United States to engage in sex work. The victims often were poor and uneducated. The traffickers in Thailand obtained visas for the women and arranged to transport them from Thailand to the United States. In exchange, victims owed the traffickers money described as "bondage debt." The debt was usually between forty and sixty thousand

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

dollars, an amount that a poor Thai woman could not pay back for many years if she sought to leave sex work in the United States and return to lawful work in Thailand.

The person to whom a victim owed her debt was called her "ma-tac" or owner. In the United States, the victims worked in "houses"—apartments, houses, or spas where the women performed commercial sex acts. "House bosses" maintained the houses, advertised services, and scheduled clients. The scheme involved houses located in urban areas throughout the United States, including in Phoenix, Minneapolis, Houston, Dallas, Chicago, Atlanta, Los Angeles, Seattle, and Austin. Other people in the organization called "runners" or "facilitators" rented the houses, collected money, booked flights and hotels, provided transportation, and assisted in laundering money.

After victims arrived in the United States, they paid off their debt by performing sex acts for money from clients. About a third of a sex worker's hourly fee was paid to the house boss for "house fees," and the rest went to her ma-tac as credit on the bondage debt. The trafficked women were scheduled to have sex with up to ten men per day, often seven days a week, until they paid off their debts.

The organization typically sent a sex worker to a particular house for about two to four weeks and then relocated her to a new house. In most cases, the large amount of debt prevented victims from trying to escape. But ma-tacs and house bosses also confiscated passports to prevent the Thai women from leaving, and they sometimes threatened to harm a woman's family if she were to run away or attempt to do so.

There are five appellants in these consolidated cases. Pawinee Unpradit is from Thailand and claims to have come to the United States as a victim of the organization. Unpradit eventually became a ma-tac in the organization, and she communicated with traffickers in Thailand to coordinate the arrival of new young women in the United States.

Saowapha Thinram came to the United States in 2012 as a victim of the organization. The organization sent her to Austin, Texas, where one of her paying customers paid off her debt. Thinram married the customer, and she became a house boss in Austin.

Thoucharin Ruttanamongkongul was a house boss in Chicago and helped to schedule clients. She partnered with at least one woman who had been under bondage debt.

Michael Morris was a house boss who ran several houses in California. He worked with other members of the organization to schedule women to work at his houses. During at least part of the conspiracy, he was a business partner of another house boss in California named Maya.

Waralee Wanless came to the United States from Thailand. She claims to have been a victim of the organization, and she became a house boss and a ma-tac in Chicago and Dallas.

All defendants were convicted at trial and sentenced to varying terms of imprisonment. They present several issues on appeal.

II.

Thinram and Unpradit argue that their convictions must be reversed because there was a variance between the conspiracy charged in the indictment and the conspiracy proved at trial. *See Kotteakos v. United States*, 328 U.S. 750 (1946). The conspiracy charged in the indictment spanned from January 2009 through May 2017, and thus included periods during which Thinram and Unpradit contend that they were victims of the conspiracy. Their theory is that because each was a victim of sex trafficking before she joined a conspiracy to engage in sex trafficking of others,

neither could be guilty of the conspiracy charged in the indictment that included her own victimization. In other words, a defendant cannot be both a victim and a member of the same conspiracy. The implication seems to be that each time any woman moved from the status of victim to member of the conspiracy, the existing conspiracy necessarily ended and a new conspiracy began.

We conclude that there was sufficient evidence to support the jury's finding that Unpradit and Thinram joined a single ongoing conspiracy to commit sex trafficking. After Thinram paid off her debt, she became a house boss. The government disputes that Unpradit ever was a victim, but in any event, the evidence showed that she too became a ma-tac and a house boss. Unpradit and Thinram shared the common overall goal of earning money by making women available for sex, and they used the same method of pressuring women under bondage debt to have sex with male customers. *See United States v. Gilbert*, 721 F.3d 1000, 1005 (8th Cir. 2013). The record thus supports a reasonable finding that Unpradit and Thinram joined the same conspiracy in which they were allegedly victims at an earlier stage.

The defendants, citing *Pinkerton v. United States*, 328 U.S. 640 (1946), say it is impossible for them to have joined the charged conspiracy, because *Pinkerton* provides that a conspirator is liable for substantive offenses committed by other conspirators in furtherance of the conspiracy. *See United States v. Overshon*, 494 F.2d 894, 896 (8th Cir. 1974). If the two women were trafficking victims during the early part of the conspiracy, the argument goes, then they could not logically be liable via *Pinkerton* for the substantive offense of trafficking themselves, and there must have been two separate conspiracies. The flaw in this theory, however, is that *Pinkerton* liability extends only to substantive offenses committed while the defendant was a member of the conspiracy. *See United States O'Campo*, 973 F.2d 1015, 1021 & n.4, 1023 n.5 (1st Cir. 1992). Thus, the jury's conclusion that Unpradit and Thinram joined the charged conspiracy does not render them liable for acts committed before they joined while they were victims of the conspiracy.

III.

Thinram also raises three challenges to the jury instructions. We review the instructions for abuse of discretion, and consider whether they fairly and adequately submitted the relevant issues to the jury. *United States v. Magallon*, 984 F.3d 1263, 1286 (8th Cir. 2021).

Thinram first argues that the district court erred by not instructing the jury that she was a victim of the alleged conspiracy as a matter of law. Thinram was free to argue that she was a victim, and the government agreed that she was a victim during a portion of the conspiracy. There was no error in the court declining to resolve the issue as a matter of law by jury instruction. Thinram also contends that the court should have instructed the jury that a person who is a victim of a conspiracy cannot later join the same conspiracy. She did not propose that instruction, however, and there was no plain error in declining to include it, because Thinram's assertion is not a correct statement of law.

Thinram next quarrels with the jury instruction on the elements of conspiracy. The conspiracy charge against Thinram required the government to prove an agreement to commit sex trafficking "by force, threats of force, fraud, or coercion, or any combination of such means." Thinram requested an instruction that "[t]he government has the burden of proving beyond a reasonable doubt that the defendant did not act in good faith with respect to the element of fraud." The district court declined the request, but did instruct that a defendant may assert good faith as a defense to fraud, and that it was for the jury "to decide whether or not a defendant acted in good faith and without intent to defraud." Thinram contends that the instructions were insufficient without a statement that the government must prove the absence of good faith.

We see no error in the district court's ruling. For one thing, fraud was not an essential element of the conspiracy charge: the government could have proved the offense with evidence of force or coercion alone. To instruct that the government must prove that the defendant "did not act in good faith with respect to the element of fraud" would risk confusing the jury when the government did not have to prove fraud at all. But even if the proposed instruction had been drafted more precisely to specify that good faith was relevant only to one of several alternative means of sex trafficking, it still would not have been a necessary addition to the court's final instructions. The court explained that the government must prove the elements of conspiracy (including fraud, if applicable) beyond a reasonable doubt, that good faith was a defense to fraud, and that the jury must decide whether the defendant "acted in good faith and without intent to defraud." The instructions thus made clear that good faith was a defense to fraud, and that before the jury could convict based on fraud, the government must prove fraud beyond a reasonable doubt. The instructions were sufficient to communicate the substance of Thinram's defense. *See United States v. Cheatham*, 899 F.2d 747, 751 (8th Cir. 1990).

Thinram next contends that the district court erred by giving an instruction on willful blindness in connection with the element of knowledge. The court instructed: "Knowledge may be inferred if the defendants deliberately closed their eyes to what would otherwise have been obvious to them. A willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."

A willful blindness instruction is proper when the defendant claims a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance. *United States v. Long*, 977 F.2d 1264, 1271 (8th Cir. 1992). Even when there is evidence of actual knowledge, a willful blindness instruction is permissible if there is sufficient evidence to support an inference of deliberate ignorance. *United States v. Hiland*, 909 F.2d 1114, 1130-31 (8th Cir. 1990). The "instruction is particularly

-8-

appropriate when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." *United States v. Regan*, 940 F.2d 1134, 1136 (8th Cir. 1991).

The record supports the district court's decision to include the willful blindness instruction. Thinram asserted in her defense that she did not know that women in the organization's sex operations were compelled to engage in commercial sex acts through force, threats of force, fraud, or coercion. Given Thinram's own history of bondage debt, there was reason to infer that any purported ignorance that other women were trafficked under bondage debt was a product of Thinram's deliberate efforts to avoid the truth.

Any error in giving the instruction was also harmless. The government proceeded principally on the theory that Thinram had actual knowledge of the details of the conspiracy, and there was sufficient evidence to support a finding of guilt on that basis. In that situation, we assume that the jury relied on a well supported theory of actual knowledge rather than an unlikely theory of deliberate indifference. *United States v. Hernandez-Mendoza*, 600 F.3d 971, 979 (8th Cir. 2010); *see Griffin v. United States*, 502 U.S. 46, 59-60 (1991).

IV.

Ruttanamongkongul challenges the sufficiency of the evidence to support her conviction for conspiracy to commit sex trafficking. She argues that the evidence was insufficient to show that she knew of the illegal purpose of the agreement and insufficient to show that she agreed to participate in a scheme to use force, fraud, or coercion to cause women to engage in commercial sex.

Viewing the evidence in the light most favorable to the verdict, the proof was sufficient to support the conviction. The government presented testimony that

Ruttanamongkongul was a facilitator and a house boss in the Chicago area and that she partnered with another house boss in Washington, D.C. A co-conspirator named Pantila "Noon" Rodphokha testified that women who were under debt to the organization worked in Ruttanamongkongul's houses, that Ruttanamongkongul worked closely with at least one woman who owned debt, and that Ruttanamongkongul had knowledge of overseas trafficking. The record shows that Wilaiwan "Pim" Phimkhalee, a house boss and ma-tac in the organization, sent e-mails to Ruttanamongkongul with escort-style photos of the women who would be working at her house. Ruttanamongkongul also posted advertisements on the website Backpage offering liaisons with women in her houses. To lease apartments for the sex work, she funneled cash through a man who paid the rent with cashier's checks in order to avoid connecting Ruttanamongkongul to the apartments or to large amounts of cash. Based on this evidence, a reasonable jury could conclude that Ruttanamongkongul knowingly agreed to engage in sex trafficking and did so with knowledge that women working in her houses were subject to coercive debt that compelled them to participate. There was sufficient evidence to support the conspiracy conviction.

V.

Morris challenges the sufficiency of the evidence to support his conviction on a substantive count of sex trafficking under 18 U.S.C. § 1591(a). He argues there was insufficient evidence to establish the elements of the substantive offense or to show that venue was proper in the District of Minnesota.

To establish the elements of the substantive offense, the government was required to prove one of two alternatives. First, it was sufficient to show that Morris knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained Chabaprai Boonluea, the named victim, and did so knowing that she would be caused to engage in a commercial sex act by means of force, threats of

-10-

force, fraud, or coercion. *Id.* § 1591(a)(1). Second, the government could meet its burden by proving that there was a "venture" that engaged in one of the sex-trafficking activities described in the first alternative, that Morris participated in some way in that venture, and that Morris benefited financially from that venture. *Id.* § 1591(a)(2). A "venture" is "any group of two or more individuals associated in fact." *Id.* § 1591(e)(6). An offender participates in a venture by "knowingly assisting, supporting, or facilitating" a substantive sex-trafficking violation. *Id.* § 1591(e)(4).

Morris does not challenge the jury's finding that he conspired to commit sex trafficking, and the evidence was sufficient that he knowingly trafficked Boonluea in particular. The prosecution presented testimony that "M," a house boss in Minnesota, sent various women under bondage debt to Morris and the houses of prostitution that he operated. Two witnesses testified that Morris and Maya were business partners, and that "M" rotated women through houses operated by the two partners.

Boonluea was a government witness at trial. She testified that she was also known by nicknames, including "Iris" and "Lily." Boonluea came to the United States under debt. "M," the house boss in Minnesota, was her ma-tac. Boonluea worked fifteen months to pay off her debt, and the house bosses did not allow her to refuse clients during that time. "M" held Boonluea's passport to keep her from running away, and threatened Boonluea's family when she expressed a desire to return to Thailand.

"M" sent Boonluea from Minnesota to different houses across the country. Boonluea testified that "M" sent her to Maya's house in Orange County, California, for two weeks in early 2010. While Boonluea was working in Orange County, Morris made dinner for Boonluea and drove her to purchase cosmetics for use in sex work. The government produced printouts of Morris's electronic calendar, which included

-11-

an entry for "Lilly" for fifteen days in September 2009. Morris points out that Boonluea spelled her nickname differently as "Lily," and that she recalled at trial nine years later that her visit to Maya's house came in early 2010 rather than late 2009. But a reasonable jury could have concluded that the discrepancies were immaterial and that the calendar corroborated testimony that Morris was involved with maintaining Boonluea when "M" sent her to stay with Maya. Indeed, Morris's closing argument at trial conceded that Boonluea "met Morris two times when she came to Maya's house in Orange County for 15 days."

This evidence was sufficient to support a finding that Morris participated in a venture with Maya and "M" to "maintain" Boonluea. A reasonable jury could have concluded that Morris knowingly helped to maintain Boonluea by providing food and transportation while knowing that she would be caused to engage in commercial sex acts by means of coercion. There was also sufficient evidence that Morris benefited financially from Boonluea's sex work because Morris and Maya were business partners, and Maya collected house fees from Boonluea while she was in Orange County. For these reasons, the record adequately supports the jury's finding that Morris committed the substantive offense under § 1591(a).

Morris also argues venue was improper in the District of Minnesota because the charged violation of § 1591(a) occurred entirely in California. The government argues that Morris waived any challenge to venue because although he filed a general motion for judgment of acquittal at the close of the evidence, *see* Fed. R. Crim. P. 29(a), he did not raise venue specifically until a motion filed after the jury returned its verdict. *See* Fed. R. Crim. P. 29(c). This court has not addressed the precise question whether a Rule 29(c) motion is sufficient to preserve a challenge to venue. Outside the context of venue, however, we have treated a sufficiency issue raised for the first time in a post-verdict motion as preserved for appeal. *United States v. Inman*, 558 F.3d 742, 747 (8th Cir. 2009); *see United States v. Miller*, 527 F.3d 54, 60-61 (3d Cir. 2008) (citing cases). In an older case, this court said in an alternative

-12-

holding that a challenge to venue was waived where the defendant stipulated before trial that venue was proper and did not dispute the issue until a post-verdict motion for new trial. *United States v. Haley*, 500 F.2d 302, 305 (8th Cir. 1974). There has been no occasion to reconcile *Haley* with more recent cases concerning motions under Rule 29(c).

Assuming for the sake of analysis that Morris adequately preserved the venue question for appellate review, we conclude that there was sufficient evidence to support a finding that venue was proper in the District of Minnesota. The evidence showed that Morris participated in a venture that facilitated a sex-trafficking violation that occurred in both California and Minnesota.

As discussed, the evidence was sufficient to show that Morris participated in a venture with Maya and "M" to maintain Boonluea, knowing that she would be caused by means of coercion to engage in commercial sex acts. The indictment charged that Morris participated in a venture from about April 2009 through about January 2010. The evidence supported a finding that the associated persons maintained Boonluea in different locations over a period of time.

A continuing offense may be tried "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). Thus, if Morris's participation in the venture to maintain Boonluea was a continuing offense that occurred in both Minnesota and California, then venue was proper in the District of Minnesota.

We conclude that the offense of benefiting from participation in a venture to "maintain" a victim of sex trafficking is a continuing offense that may occur in more than one district. The nature of the crime is such that Congress must have intended it to be treated as continuing rather than as a series of individual violations for each moment in time that a victim is "maintained." *See Toussie v. United States*, 397 U.S.

-13-

112, 115 (1970).  In this very case, Morris did not object to the district court's jury instruction that a venture is an "ongoing" activity that may occur over a "period of time," and that a defendant could participate "throughout the length of the venture." R. Doc. 991, at 33-34.

The decision in *Ex parte Nielsen*, 131 U.S. 176 (1889), is illustrative.  There, the Court explained that the federal offense of "cohabit[ing] with more than one woman" was "inherently a continuous offense, having duration, and not an offense consisting of an isolated act."  *Id.* at 186 (internal quotation omitted).  As such, the offense spanned the entire thirty-one months covered by the indictment and did not occur repeatedly each week or month within that period.  *See id.* at 177, 186.  The sex-trafficking offense at issue here is comparable.  Offenders under § 1591(a) sometimes maintain a victim continuously over a period of time, and that conduct amounts to a single offense rather than a series of isolated acts of maintenance. While it is true that the offender must know about the prospective use of force, fraud, or coercion at the time the offender knowingly maintains the victim, *see United States v. Marcus*, 538 F.3d 97, 102 n.7 (2d Cir. 2008), the maintenance of the sex worker and the offender's knowledge can persist over time in a single violation.

With this understanding of Morris's violation, the evidence was sufficient to support a finding that venue was proper in the District of Minnesota.  If Morris had requested a jury determination on venue, the evidence would have supported a finding that Morris was part of a venture with Maya and "M" to maintain Boonluea that acted in both Minnesota and California over a period of time.  Accordingly, venue was proper in the District of Minnesota under 18 U.S.C. § 3237(a). *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 282 (1999).

VI.

Several of the defendants argue that the district court erred at sentencing in calculating the base offense level for a conspiracy to engage in sex trafficking under 18 U.S.C. § 1594. The district court applied a base offense level of 34 based on USSG §§ 2X1.1 and 2G1.1; the defendants contend that the level should be 14. In *United States v. Carter*, 960 F.3d 1007 (8th Cir. 2020), this court held that the correct base offense level is 34. *Id.* at 1013-15. Therefore, this point on appeal is foreclosed by *Carter*.

VII.

Unpradit challenges the district court's orders of restitution and forfeiture. The court ordered Unpradit to pay $400,000 in restitution, and ordered forfeiture of two cellular phones and a money judgment of $400,000. We review the district court's factual determinations for clear error. *United States v. Gregoire*, 638 F.3d 962, 973 (8th Cir. 2011).

The Trafficking Victims Protection Act provides that when a defendant is convicted of conspiracy under 18 U.S.C. § 1594, the court must order restitution for the "full amount of the victim's losses." 18 U.S.C. § 1593. These losses include costs incurred by a victim that are a proximate result of the offense, as well as "the gross income or value to the defendant of the victim's services or labor." 18 U.S.C. §§ 1593(a)(3), 2259(c)(2). The government must prove the amount of restitution by a preponderance of the evidence. *See United States v. DeRosier*, 501 F.3d 888, 896 (8th Cir. 2007).

The district court found that a restitution award of $400,000 was appropriate. The court found that the government's submission appropriately identified victims of the conspiracy, and that the restitution amount was appropriately compensatory

and tailored to Unpradit's role in the greater scheme. As support for a restitution amount of $400,000, the court also cited the declaration of a special agent from the Internal Revenue Service who averred that Unpradit deposited $444,101 of income—unreported to the IRS—into her bank account between 2011 and 2016. The agent observed that $380,000 of the deposits were cash and suggested that the most likely source of the deposits was earnings from sex-trafficking and prostitution-related activities.

We see no clear error in the district court's finding. The IRS agent's declaration supported a finding that Unpradit more likely than not collected $400,000 of gross income from the victims' services. Alternatively, the record also supported a finding that Unpradit participated in trafficking at least ten victims. With evidence that each victim typically paid a debt of $40,000 to $60,000 to her ma-tac and paid house fees that totaled about half of the bondage debt, there was a sufficient basis to conclude that Unpradit's offense proximately caused losses of at least $400,000. *See United States v. Williams*, 5 F.4th 1295, 1305-06 (11th Cir. 2021).

Unpradit raises several procedural challenges to the forfeiture order. She argues first that the district court erred by failing to retain the trial jury or to empanel a new jury to decide the forfeiture issues. The governing rule of procedure, however, provides only that the court must determine whether either party requests that the jury be retained "to determine the forfeitability of specific property if it returns a guilty verdict." Fed. R. Crim. P. 32.2(b)(5)(A). The rule does not entitle a defendant to a jury's decision on the amount of a money judgment, so there was no error in that respect. *Gregoire*, 638 F.3d at 971-72. After the government reported before and during trial that no defendant had yet requested a jury determination on forfeiture, and Unpradit did not make such a request during the conference on jury instructions, the court may have inferred that no party requested a jury determination as to forfeitability of the cell phones. But even if the court erred by not inquiring of the

parties before the jury deliberated, the court retained jurisdiction to resolve the matter later.  *United States v. Williams*, 720 F.3d 674, 700-702 (8th Cir. 2013).

Unpradit also contends that the district court erred by not determining forfeiture "as soon as practical" after the verdict, and by declining to conduct a hearing on Unpradit's request.  *See* Fed. R. Crim. P. 32.2(b)(1).  We conclude that any procedural error was harmless.  Unpradit states a desire to contest the amount of the money judgment and the nexus between the cell phones and the conspiracy, but does not explain how an earlier determination or a hearing would have augmented the record or undermined the evidence on which the district court relied.  The same forensic analysis of Unpradit's bank accounts that justified the restitution order supports the money judgment of $400,000.  *See United States v. Elder*, 682 F.3d 1065, 1072-73 (8th Cir. 2012).  Evidence showed that the cell phones were used to communicate with people in Thailand and the United States about women coming to the United States for commercial sex, to communicate with house bosses (including Morris), and to send and receive photographs of sex workers under bondage debt. We therefore conclude that the forfeiture order is proper.

VIII.

Wanless appeals the district court's order denying her motion for new trial.  If her conviction is sustained, then Wanless also asserts that the court committed errors at sentencing.

Wanless first contends that the government withheld exculpatory information in violation of her due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The disputed information concerns the source of certain evidence presented by the prosecution.  When investigators searched Wanless's home in 2017, they seized boxes that contained documents and electronics.  One seized item was a ledger that contained financial information related to sex trafficking.

-17-

Wanless alleges that the contents of the boxes were first seized by police during a search at the home of one Casey Benson in Addison, Texas in 2013. According to Wanless, police in Addison seized the items from Benson as part of a local sex-trafficking investigation, but when the Addison case was dismissed due to misconduct (embezzlement) by the lead investigator on the case, the evidence was returned to Benson in 2016. Wanless claims that the government did not timely disclose that the documents seized from her home in 2017 were part of the Benson seizure in 2013. She maintains that the alleged non-disclosure was prejudicial because if the history of the materials were known, then the evidence would have been inadmissible or undermined, in part because Benson lived with another Thai woman who could have prepared the ledger.

The district court concluded that the government did timely disclose the relevant information, and that there was no prejudice to Wanless. The court found that the prosecution provided to Wanless's counsel (1) photographs of items seized in 2013, (2) nearly 400 pages of materials related to the Addison case, (3) the details of the Addison case, including the reasons for its dismissal, and (4) information about chain of custody of the documents seized from Wanless. The court found that these disclosures allowed Wanless sufficient time to prepare a defense. Wanless also complained that the documents were stored in two boxes rather than in a single "original" box, but the court found that nothing about the nature of the storage containers discredited the evidence or justified any relief.

Wanless renews her contentions on appeal, but there was no clear error in the district court's findings and no legal error in its conclusion. The record supports the findings that the government disclosed information about the 2013 seizures, including that some of the evidence seized from Wanless in 2017 had earlier been seized during the 2013 investigation. Wanless had an opportunity at trial to present evidence about chain of custody and to raise questions about who was responsible for preparing the

disputed ledger and other documents. She has not established non-disclosure of material exculpatory evidence.

Wanless also contends that the district court should have granted a new trial based on prosecutorial misconduct. She argues that a prosecutor falsely stated during a bench conference that the disputed ledger was seized from Wanless in 2017 rather than in Addison during 2013. But the record is consistent with the conclusion that the same evidence was seized twice—once in 2013 and then, after the evidence was returned, again in 2017. The prosecutor's statement during the bench conference did not preclude Wanless from cross-examining the witness about an earlier seizure in 2013 if she thought such evidence would be useful to the defense.

Wanless cites a witness's statement that financial documents obtained from Wanless were seized pursuant to "a search warrant at her home" when the 2017 search was actually conducted based on Wanless's consent. Wanless believes that the witness's statement misled the jury about the source of the ledger and financial documents. That the witness misstated the authority for the search, however, does not amount to prosecutorial misconduct or otherwise justify a new trial. If the nature of the authority for the search was relevant to the defense, then it was a proper subject for cross-examination.

Wanless next complains about a statement by the prosecutor during final rebuttal argument that "[w]e didn't hear from Wan about the ledger." Wanless argues that this statement was an improper comment on her constitutional right to remain silent. The district court rejected this argument on the ground that the prosecutor was critiquing or evaluating defense counsel's final argument (which did not address the significance of the ledger), and that the transcript "clearly shows that the comment was taken out of context" in Wanless's request for a new trial. We agree with this conclusion and see no reasonable probability that a jury would have viewed the

remark as a comment on Wanless's failure to testify. *See United States v. Morris*, 817 F.3d 1116, 1122 (8th Cir. 2016).

Wanless also asserts that she is entitled to a new trial based on ineffective assistance of trial counsel. Ordinarily, claims asserting ineffective assistance of counsel should be raised in post-conviction proceedings, but the record here is adequately developed, and the district court ruled on the claim, so we proceed to address it on direct appeal. *See United States v. Hubbard*, 638 F.3d 866, 869-70 (8th Cir. 2011). To succeed on this claim, Wanless must show that counsel's performance was deficient and that the deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Wanless alleges several errors by trial counsel. First, she asserts that counsel was ineffective for stipulating to evidence seized in the 2017 search. Counsel actually stipulated to the chain of custody for this evidence, and the district court accurately pointed out that there was a chain of custody. Hence, counsel's stipulation to what could have been proved was not ineffective. Second, Wanless criticizes counsel's failure to impeach a prosecution witness who testified about financial documents seized in 2017. She argues that counsel could have established that the documents were seized in the Benson search four years earlier. Additional questioning might have clarified that the documents were seized twice. But Wanless has not demonstrated that counsel could have shown that the documents were never seized in 2017 at all, or that evidence of a previous seizure in 2013 would have exculpated Wanless, so counsel's performance was not ineffective or prejudicial. Third, Wanless contends that counsel should have pursued a defense theory that she was a "solo provider" after 2013, and was therefore not guilty of conspiracy. The district court found that counsel's decision not to follow this approach was a strategic decision that was virtually unchallengeable under the Sixth Amendment. We see no basis to overturn that decision, especially given that the charged conspiracy began in 2009, and the government was not required to prove that Wanless participated after

-20-

2013 in order to obtain a conviction. For these reasons, the district court did not err in rejecting Wanless's claim that trial counsel provided ineffective assistance.

Wanless's last several claims relate to sentencing and forfeiture. The court imposed a term of 144 months' imprisonment. Wanless argues that the court erred by failing to make findings about the scope of her "relevant conduct" under the sentencing guidelines. *See* USSG § 1B1.3. Wanless does not explain, however, why any of the district court's calculations under the sentencing guidelines were erroneous, or why any additional findings were required to resolve issues under the guidelines. We therefore reject Wanless's challenge to her term of imprisonment.

Wanless also disputes the district court's order of forfeiture. In December 2019, approximately a year after the jury's verdict, the district court issued a preliminary order of forfeiture. The order entered a money judgment forfeiture of $1,000,000, and provided for the forfeiture of several items of property, including cash seized from bank accounts and electronic devices.

At a sentencing hearing in September 2020, Wanless asked the court to impose "the same forfeiture" that was imposed with respect to her co-defendant "Noon." The government asked the court to finalize the preliminary forfeiture order and incorporate it into the judgment. The court opted instead to "reserve the right to impose a final order for forfeiture for a period of 30 days," and allowed the parties to send "final submissions" related to forfeiture. The court then entered a written judgment stating that "[t]he defendant shall forfeit . . . [a]ll property as indicated in the Preliminary Order of Forfeiture dated 12/4/2019."

The parties filed written briefs regarding forfeiture, and Wanless requested a hearing. In February 2021, the court denied Wanless's request for a hearing and overruled her objections to the preliminary order of forfeiture. The court found that there was a sufficient nexus between Wanless's crimes and the forfeited property and

funds, and that the money judgment was reasonable. The preliminary order thus became final.

Wanless first argues that the forfeiture order has no effect because it was not included in the final judgment. Although the written judgment included a forfeiture provision, Wanless argues that the court's oral pronouncement controls, and the court said at sentencing that it would reserve judgment on forfeiture for thirty days. Even assuming, however, that the forfeiture was not properly included in the judgment as of September 2020, it was permissible for the court to correct that omission at a later date. *See* Fed. R. Crim. P. 32.2(b)(4); *United States v. Shakur*, 691 F.3d 979, 987 (8th Cir. 2012); *United States v. Hatcher*, 323 F.3d 666, 673-74 (8th Cir. 2003). The order of February 2021 denying objections to the preliminary order served as that correction. Wanless maintains that the government was required to appeal the omission of forfeiture from the judgment in September 2020, but it was sufficient for the government to rely on the district court's authority to correct an omission in the judgment at a later date.

Wanless also contends that the district court denied her due process of law when it denied her request for a hearing on forfeiture. In her objections to the preliminary order of forfeiture, Wanless asserted that she was entitled to have a jury determine the nexus between cited property and the offense. Citing the absence of a jury finding, Wanless sought an evidentiary hearing on forfeiture under Federal Rule 32.2(b)(1)(B). On appeal, she cites the rule's provision that "[i]f the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Fed. R. Crim. P. 32.2(b)(1)(B). Wanless seems to argue that the district court's alleged failure to follow the rule amounts to a constitutional deprivation.

Under the circumstances of this case, we conclude that the district court was not required to hold a hearing. The court entered a preliminary order of forfeiture ten

-22-

months before sentencing. From then until sentencing, Wanless neither objected to the order nor requested a hearing. To the contrary, at sentencing, Wanless asked the court to impose the same forfeiture order that applied to a co-defendant who was ordered to forfeit a money judgeit of $1,000,000, a flash drive, and a cell phone. This request essentially matched the preliminary order against Wanless for a money judgment forfeiture of $1,000,000 and the forfeiture of electronic devices and cash from bank accounts. The court nonetheless granted the parties an opportunity to make "final submissions" in writing while reserving judgment on forfeiture for thirty days. Only then did Wanless request an evidentiary hearing. At that point, Wanless's request for a hearing was untimely, and the court properly declined to grant it. The court could have entered the final order of forfeiture at sentencing, and its gratuitous willingness to entertain written submissions for thirty days after sentencing did not entitle Wanless to an evidentiary hearing or deprive her of due process.

\* \* \*

For these reasons, the judgments of the district court are affirmed.

_____